Hoffman, J.
{¶ 1} Defendant-appellant Michael Garn appeals his convictions entered by the Richland County Court of Common Pleas on numerous counts including: unauthorized use of LEADS, dereliction of duty, tampering with evidence, sexual battery and menacing by stalking. Plaintiff-appellee is the state of Ohio.
STATEMENT OF THE FACTS AND CASE.[1] ,[2]
{¶ 2} At all times relevant, Appellant was employed as a police officer with the *112 Mansfield Police Department. As part of his job responsibilities, Appellant was assigned to traffic enforcement detail, including the STEP detail (Selective Traffic Enforcement Program) as an overtime detail.
{¶ 3} Appellant was certified in the use of the Law Enforcement Automated Database System (LEADS), and completed recertification tests, scoring high percentages. Appellant testified at trial he ran LEADS searches routinely as part of his traffic enforcement duties. Appellant testified he understood LEADS could not be used for an unlawful purpose or for personal gain.
{¶ 4} On February 26, 2015, in Case No. 2015CR197, the Richland County Grand Jury indicted Appellant on 17 counts of LEADS violations, 14 counts of dereliction of duty, one count of burglary, one count of trespass, one count of attempted gross sexual imposition, one count of attempted sexual battery, one count of menacing, two counts of tampering with evidence, one count of sexual battery, and one count of public indecency. On July 10, 2015, the Richland County Grand Jury indicted Appellant on one count of menacing by stalking, in violation of R.C. 2903.211(A)(1), in case number 2015 CR 637. On July 24, 2015, the trial court joined 2015 CR 197 with the indictment in 2015 CR 637.[3]
{¶ 5} On March 25, 2016, Appellant moved the trial court to dismiss the LEADS violation charges as being unconstitutionally vague. The State filed a response to the motion. Via Judgment Entry of March 31, 2016, the trial court denied Appellant's motion to dismiss the LEADS violations.
{¶ 6} Following a jury trial, Appellant was convicted of 12 counts of unauthorized use of LEADS, in violation of R.C. 2913.04(C), a fifth degree felony (Counts 3, 5, 6, 9-17); 11 counts of dereliction of duty, in violation of R.C. 2921.44(E), a misdemeanor of the second degree (Counts 19, 22-29, 31); one count of tampering with evidence, in violation of R.C. 2921.12(A)(1), a third degree felony (Count 37); and one count of sexual battery, in violation of R.C. 2907.03(A)(1) (Count 39).[4] Appellant was also convicted of one count of menacing by stalking, in violation of R.C. 2903.211(A)(1), in Case No. 2015 CR 637.
{¶ 7} The trial court entered sentence on April 20, 2016, imposing a twelve month prison term on Counts 3, 5, 6, 9, 10, 11, 12, 13, 14, 15, 16, and 17. The trial court found counts 19, 22, 23, 24, 25, 26, 27, 28, 29, and 31 merged with Appellant's sentence on other counts. The trial court imposed a thirty-six month prison term on count 37 (tampering with evidence), and a 60 month prison term on count 39 (sexual battery). The trial court ordered the sentences on counts 3, 15, 16, 37, 39 and the sentence imposed in case number 2015 CR 637 run consecutively, and the other remaining counts run concurrently. The trial court classified Appellant a Tier III sex offender for his conviction on a sexually oriented offense. Via separate Sentencing Entry in 2015 CR 637, the trial court sentenced Appellant to eighteen months in prison on *113 the conviction for menacing by stalking, to run consecutive to Appellant's sentence in 2015 CR 197, for a total sentence of 12 ½ years in prison.[5]
{¶ 8} Appellant appeals, assigning as error:
I. APPELLANT'S CONVICTIONS FOR VIOLATION OF THE LAW ENFORCEMENT AUTOMATED DATABASE SYSTEM (LEADS) STATUTE AND FOR DERELICTION OF DUTY IN THAT REGARD VIOLATED HIS RIGHTS TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION, ON THE GROUNDS THAT THE STATUTE IS UNCONSTITUTIONAL.
II. THE DEFENDANT'S CONVICTION FOR VIOLATION OF THE LEADS STATUTE IS BASED UPON INSUFFICIENT EVIDENCE, AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF DEFENDANT'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
III. THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE OF KRYSTAL SAWYER'S PRISON DISCIPLINE RECORD REGARDING A FALSE ALLEGATION OF SEXUAL ACTIVITY, TO THE PREJUDICE OF DEFENDANT'S RIGHT TO CONFRONT WITNESSES AND TO PRESENT A DEFENSE UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
IV. THE DEFENDANT'S CONVICTION FOR TAMPERING WITH EVIDENCE IS BASED UPON INSUFFICIENT EVIDENCE, AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF DEFENDANT'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
V. THE DEFENDANT'S CONVICTION FOR MENACING BY STALKING IS BASED UPON INSUFFICIENT EVIDENCE, AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF DEFENDANT'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
I.
{¶ 9} In the first assigned error, Appellant maintains his convictions for LEADS violations are unconstitutional as the statute is void for vagueness. Specifically, Appellant asserts the statute fails to provide notice of proscribed behavior, and the statute impermissibly allows the executive branch to determine what constitutes a violation of law.
{¶ 10} R.C. 2913.04 (C) and (D) read,
(C) No person shall knowingly gain access to, attempt to gain access to, cause access to be granted to, or disseminate *114 information gained from access to the law enforcement automated database system created pursuant to section 5503.10 of the Revised Code without the consent of, or beyond the scope of the express or implied consent of, the chair of the law enforcement automated data system steering committee.
(D) No person shall knowingly gain access to, attempt to gain access to, cause access to be granted to, or disseminate information gained from access to the Ohio law enforcement gateway established and operated pursuant to division (C)(1) of section 109.57 of the Revised Code without the consent of, or beyond the scope of the express or implied consent of, the superintendent of the bureau of criminal identification and investigation.
{¶ 11} The trial court's March 31, 2016 Judgment Entry overruling Appellant's motion to dismiss states,
Notice in cases charged under this statute comes, not from the statute, but from work place manuals, policies and, to some extent, common sense. An employee should be on notice that committing crimes or engaging in conduct that has a negative impact on the company while using a work computer would be against the implied consent granted by his or her workplace.
* * *
This Administrative Code section in and of itself specifies the extent of consent officers have for use of LEADS. [Citing OAC Ann. 4501:2-10-06(C) ]
* * *
It is clear from this Administrative Code section that LEADS is to be used for the administration of criminal justice and not for personal use. Further, as pointed out by the Defendant, there are policies and guidelines that agencies participating in LEADS must adhere to that are published in the NCIC operating manual, DJIS security policy, LEADS operating manual, LEADS security policy, newsletters, and administrative messages from LEADS. [Citing OAC Ann. 4501:2-10-03(C)(3).] Whether these policies are subject to change does not alter the basic fact that these databases are for law enforcement purpose only and personal use for any reason goes beyond the express consent of the chair of the law enforcement automated data system steering committee and/or the superintendent of the bureau of criminal identification and investigation.
{¶ 12} Appellant was convicted of twelve counts of unauthorized use of the LEADS database, in violation of R.C. 2913.04(C) and (D). In support of his argument the statute is unconstitutionally vague, Appellant cites the testimony of various law enforcement officers at trial as to arbitrary compliance and standards of practice. We note Appellant did not renew the motion to dismiss the charges following the trial court's denial of his motion to dismiss on March 31, 2016. As the trial court overruled Appellant's motion prior to trial, the subsequent trial testimony offered in support of Appellant's argument cannot be considered.[6]
{¶ 13} Legislative enactments are afforded a strong presumption of constitutionality. State v. Collier (1991), 62 Ohio St.3d 267, 269, 581 N.E.2d 552. When possible, statutes are to be construed in favor of conformity with the Ohio and United States Constitutions. Id. A party asserting a statute is unconstitutional must *115 prove the statute is unconstitutional beyond a reasonable doubt. Id.
{¶ 14} The critical question in all cases as to void for vagueness is whether the law affords a reasonable individual of ordinary intelligence fair notice and sufficient definition and guidance to enable him to conform his conduct to the law. City of Norwood v. Horney, 110 Ohio St.3d 353, 380, 853 N.E.2d 1115 (2006).
{¶ 15} Statutes which do not fairly inform a person of what is prohibited will be found unconstitutional as violative of due process. State v. Carrick, 131 Ohio St.3d 340, 2012-Ohio-608, 965 N.E.2d 264, ¶ 14, citing State v. Reeder, 18 Ohio St.3d 25, 26, 479 N.E.2d 280 (1985) and Connally v. Gen. Constr. Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926) ; Columbus v. Thompson, 25 Ohio St.2d 26, 266 N.E.2d 571 (1971). However, " '[i]mpossible standards of specificity are not required. * * * The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.' " Id. at ¶ 14, quoting Jordan v. De George, 341 U.S. 223, 231-232, 71 S.Ct. 703, 95 L.Ed. 886 (1951).
{¶ 16} A facial challenge requires "the challenging party * * * show that the statute is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.' " Carrick, supra, 131 Ohio St.3d 340, 2012-Ohio-608, 965 N.E.2d 264, at ¶ 15, citing State v. Anderson, 57 Ohio St.3d 168, 171, 566 N.E.2d 1224 (1991), quoting Coates v. Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). Stated another way, "the challenger must show that upon examining the statute, an individual of ordinary intelligence would not understand what he is required to do under the law." Id. Appellant "must prove, beyond a reasonable doubt that the statute was so unclear that he could not reasonably understand that it prohibited the acts in which he engaged." Id., citing United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954) ; 25 Ohio Jurisprudence 3d, Criminal Law, Section 8, at 106 (1981). See, In re L.Z., 2016-Ohio-1337, 61 N.E.3d 776.
{¶ 17} We find the statute is not void for vagueness. Appellant, a law enforcement officer, could and should have understood his duties and responsibilities with regard to utilizing the LEADS system for legitimate law enforcement purposes. Appellant knew or should have known the acts which would be against the expressed or implied consent of the law enforcement automated data system steering committee and/or the superintendent of the bureau of criminal identification and investigation. The evidence demonstrates Appellant was LEADS certified, and successfully completed retesting, scoring high averages. The Ohio Administrative Code sections cited by the trial court herein provide adequate notice of what Appellant is required to do or prohibited to do under the statute.
{¶ 18} In State v. Johnson, 8th Dist. Cuyahoga No. 59190, 1992 WL 25312, the Eighth District held a previous version of R.C. 2913.04 was constitutional and not void for vagueness. The statute was less specific than the version at issue herein.[7]
*116 {¶ 19} We further find the statute does not violate the separation of powers doctrine. The statute prohibits a person from knowingly gaining access to the LEADS system without the consent of or beyond the scope of express or implied consent of the chair of the LEADS steering committee or the superintendent of the bureau of criminal identification and investigation. We disagree with Appellant's argument the statute allows the executive branch to define the elements of the crime.
{¶ 20} The legislature clearly prohibited a person from knowingly gaining access to the LEADS system either beyond the scope of consent of the chair of the LEADS steering committee or the superintendent of the bureau of criminal identification and investigation. As both the chair and superintendent govern the use of the LEADS system, the statute does not allow them to define the elements of the crime; rather, to oversee the use of and administration of the LEADS system. Whether the policies are subject to change does not alter the fact the databases were for law enforcement purposes only, and personal use for any reason is beyond the consent either expressed or implied.
{¶ 21} The first assignment of error is overruled.
II, IV and V.
{¶ 22} The second, fourth and fifth assigned errors raise common and interrelated issues; therefore, we will address the arguments together.
{¶ 23} Appellant maintains his convictions for violations of the LEADS statute, tampering with evidence and menacing by stalking are not supported by the manifest weight and sufficiency of the evidence.
{¶ 24} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " State v. Thompkins, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting State v. Martin, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983).
{¶ 25} An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus (1991).
{¶ 26} "The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, at paragraph one of the syllabus. The trier of fact is in the best position to judge the credibility of the witnesses.
LEADS Violations [8]
{¶ 27} At trial, the State demonstrated Appellant performed numerous LEADS checks without a legitimate law enforcement purpose. The State indicated Appellant did not introduce documentation demonstrating Appellant performed the *117 LEADS searches for a legitimate law enforcement purpose, in rebuttal to the State's evidence and testimony of various witnesses demonstrating the searches were not reasonably related to a legitimate law enforcement purpose. In addition, Appellant admitted to inappropriate LEADS searches with regard to Kelly Harding and Rebecca Buhler.
{¶ 28} Counts three, five and six allege LEADS violations as to Kelly Harding. The Bill of Particulars states,
...defendant ran [Harding] through the system seven separate times. The discovery provided to counsel specifically list the dates of these occurrences which are: June 15, 2012; December 8, 2012; March 25, 2013; April 12, 2013; August 19, 2013; January 15, 2014 and July 26, 2014. The first time [Harding] was run was for a law enforcement purpose (ie the stop on June 15, 2012 was for a speeding violation). The next six times form the basis of counts 1 through 6 of the indictment.[9]
{¶ 29} On June 15, 2012 Appellant stopped Harding for speeding.[10] Harding testified at trial, she was not cited or given a warning in exchange for giving Appellant her phone number. Appellant immediately called her to verify she gave him the correct number.
{¶ 30} Following the traffic stop, Appellant would stop at Harding's house to talk. Harding testified Appellant began coming over more frequently, and would come over "every time he was on duty." Tr. at 240. While on STEP patrol, Appellant would park his cruiser directly in front of Harding's house, while other officers would park at a different location while performing the same detail. Tr. at 244. Harding testified Appellant never visited her for law enforcement purposes, and she never asked Appellant to run her license through LEADS. Tr. at 240.
{¶ 31} Appellant stated at trial Harding asked him to run her information through LEADS to find out whether her license was suspended. Testimony presented at trial demonstrates the search was not a legitimate law enforcement purpose. Tr. at 571, 626-627. Appellant did not offer a legitimate law enforcement purpose for the LEADS searches pertaining to Kelly Harding.
{¶ 32} Count Nine pertains to Edward Walker, and alleges Appellant ran Walker through the system for no law enforcement purpose on July 7, 2013. Walker testified at trial Kelly Harding is his sister, and he had knowledge Appellant would often park outside of his sister's house. He stated he never met Appellant, but was at Harding's house when he showed up, but did not actually meet him. Appellant never issued a citation to Walker, and he never conducted a traffic stop involving Walker. Walker specifically testified he was not stopped by Appellant on July 7, 2013, and was not aware his information had been ran through LEADS. Tr. at 413. Appellant testified at trial he could not remember the reason for the LEADS check of Edward Walker, and did not demonstrate a legitimate law enforcement purpose in rebuttal to the State's evidence.
{¶ 33} Count Eleven alleges Appellant ran Mike Napier through the system on *118 February 16, 2014 with no law enforcement purpose. Napier is an officer with the Mansfield Police Department, and was on duty on February 16, 2014, performing standard traffic control. He testified Appellant sent him a picture through his cruiser computer of his past BMV pictures obtained through LEADS. Napier testified it was his understanding the LEADS system could only be used for a reason, "like when you're getting ready to stop them." Tr. at 763. Officer Napier testified there is no law enforcement purpose for running a fellow law officer through LEADS. Tr. at 777. Appellant maintains he conducted the search during a ride-a-long with Rebecca Buhler.
{¶ 34} Counts Twelve through Fourteen state Appellant ran Rebecca Buhler through the LEADS system with no law enforcement purpose on February 16, 2014, April 1, 2014 and April 26, 2014. Count Ten alleges Appellant ran Eric Buhler through the system with no law enforcement purpose on February 16, 2014.
{¶ 35} Rebecca Buhler testified she did a ride-a-long with Appellant on February 16, 2014. Appellant testified at trial he conducted a LEADS search of Buhler to ascertain whether she had any outstanding warrants prior to the ride-a-long. However, Buhler testified she completed an application with her social security number, driver's license number and date of birth prior to the ride-a-long. Dispatch then verified Buhler did not have any warrants or other citations pending.
{¶ 36} During the February 16, 2015 ride-a-long, Buhler testified Appellant ran Eric Buhler's name through the system. Eric Buhler is Rebecca Buhler's father, and she gave Appellant his information. Appellant claims he was demonstrating to Buhler how the LEADS system worked. Tr. at 670. He then ran Rebecca Buhler through the system, and showed her the LEADS information pertaining to her. Testimony at trial demonstrates the search was not for a legitimate law enforcement purpose. Tr. at 79-93, 136, 152-194. Appellant cannot provide any evidence of any interaction between Buhler and law enforcement warranting a LEADS check.
{¶ 37} On April 26, 2014, Rebecca Buhler was working at a bowling alley in Richland County, and observed Appellant working STEP patrol. She approached Appellant and asked him to run her information to see if her license was suspended. Appellant also ran Officers Reed and Webb's information through LEADS, with no law enforcement purpose; rather, to make fun of their pictures. Tr. at 679, 682.
{¶ 38} Rebecca Buhler testified Appellant never stopped her for a traffic citation on the dates at issue, her driver's license was not suspended, and she did not have any restrictions.
{¶ 39} Count Fifteen maintains Appellant ran James Reed through the LEADS system with no law enforcement purpose on April 26, 2014. Reed testified at trial he works for the Mansfield Police Department. Officer Reed stated on March 26, 2014, he was not stopped by Appellant, and Appellant did not have any reason to run him through the LEADS system. Tr. at 724. Appellant cannot provide a valid law enforcement purpose for conducting the search, and testified he does not recall searching Officer Reed. Tr. at 1101.
{¶ 40} Officer Reed testified the LEADS Manual defines "administration of criminal justice" as "the performance of any of the following activities: Detection, apprehension, detention, pretrial release, post-trial release, prosecution, adjudication, correctional supervision, rehabilitation of accused person or criminal offenders." States Exhibit 37; Tr. at 726.
*119 {¶ 41} Count Sixteen states Appellant ran Paul Webb through the system, three times, with no law enforcement purpose on April 26, 2014. Webb works for the Mansfield Police Department. Officer Webb testified he is trained in LEADS, and the system must be used for an associated law enforcement reason. Tr. at 703. He testified he did not commit any traffic infraction on April 26, 2014, and was not stopped by Appellant. Officer Webb testified he was on duty and would have been driving a cruiser or riding as a passenger at the time of the LEADS search. Tr. at 705.
{¶ 42} Finally, Count Seventeen pertains to Dicky Carver and asserts Appellant ran Carver through the system on June 16, 2014 with no law enforcement purpose. Carver testified at trial he is friends with Kelly Harding. On June 16, 2014 Carver rode his motorcycle to Harding's house. Tr. at 269. He purchased the motorcycle in March of 2014, and had a motorcycle permit. Id. He did not have a suspended license. Id. While outside with Harding, Carver observed Appellant's cruiser parked nearby. Carver testified Harding expressed concern to him about the location of the cruiser, and Appellant's actions. Carver then called his cousin at the Mansfield Police Department, relaying the concerns. Carver was never stopped by Appellant for a traffic infraction, never received a warning or a ticket, and had no knowledge Appellant ran his name through the LEADS system.[11] The search was conducted one day after Carver had learned of Appellant's alleged harassment of Harding.
{¶ 43} Appellant cannot provide a valid law enforcement purpose for knowingly gaining access to the LEADS system on the dates and for the searches on which he was convicted. As an officer, Appellant had an obligation to know the rules and procedures relative to the LEADS system. Appellant successfully completed LEADS certification, and scored high on his retesting.
{¶ 44} Based upon all of the above, Appellant's assignments of error II, IV and V are overruled.
Menacing By Stalking
{¶ 45} Appellant was convicted of one count of menacing by stalking, in violation of R.C. 2903.211(A). The statute reads,
(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person. In addition to any other basis for the other person's belief that the offender will cause physical harm to the other person or the other person's family or household member or mental distress to the other person or the other person's family or household member, the other person's belief or mental distress may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.
{¶ 46} Kelly Harding testified at trial Appellant had stopped her for speeding on June 26, 2013. Appellant indicated he would not give Harding a speeding citation, if she provided him with her phone number. Harding gave Appellant her number, and in exchange, Appellant did not *120 cite her or issue her a warning. Appellant immediately called Harding to verify the number.
{¶ 47} Appellant then began calling Harding and showing up at her home uninvited. Tr at 241-242. Harding stated the visits became more and more frequent, and Appellant would stop "every time he was on duty." Tr. at 240. While on STEP patrol, Appellant routinely parked his cruiser directly across the street from Harding's home. Harding testified other officers did not park in the same location while on the same STEP patrol. Tr. at 244. Harding considered Appellant's behavior inappropriate and it made her feel uncomfortable. Id.
{¶ 48} On one occasion, Harding's ex-husband had visited her and Appellant asked her to, "Make it up to him." Tr. at 246. He asked her to kiss him. Id. Harding told Appellant "no" when he tried to kiss her. Id. Appellant tried to kiss Harding and have her touch his penis in her kitchen, which she did not want to do. Tr. at 247-248. Harding admitted she never asked Appellant to stop contacting her, nor did she ever ask Appellant to leave.
{¶ 49} On cross-examination, Harding testified she purchased a number of different cell phones, providing Appellant with the number. She stated, if she did not give Appellant her new number, he would "show up" at her house, asking why her phone number was not working. Tr. at 253.
{¶ 50} On re-direct, Harding testified she was afraid of Appellant, and "what he was capable of." Tr. at 164. Appellant told her friend Dicky Carver of her concerns with Appellant. She told him she was uncomfortable with Appellant's behavior and did not want him to come around. Harding did not ask Appellant to leave when he came over, and she would text him occasionally. However, she stated Appellant was always parked next to her house, and she was afraid of him. Tr. at 264.
{¶ 51} R.C. 2903.211(A)(1) /(B)(2) provides that "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." "Knowingly" is one of the culpable mental states defined in R.C. 2901.22(B) : "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
{¶ 52} Appellant maintains the State failed to demonstrate he acted knowingly, and Harding never requested he stop contacting her or told him she was afraid of him. In State v. Barnhardt , the Ninth District held,
The jury could reasonably conclude that Appellant knew that when he consistently made sexual comments to women and repeatedly pursued them around town while wearing his police uniform and carrying a firearm, that these women would suffer mental distress.
Appellant contends that none of the women appeared afraid or upset with him during any of these encounters. However, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230 [227 N.E.2d 212], at paragraph one of the syllabus. The trier of fact is in the best position to judge the credibility of the witnesses. In this case the jury believed the victims' testimony.
{¶ 53} We similarly find the jury did not lose its way, when viewing the evidence in a light most favorable to the prosecution, in finding Appellant should have known *121 such circumstances probably exist, when Appellant parked outside of Harding's house and entered Harding's house while on duty, in uniform and driving his cruiser. Appellant made comments to Harding, pursuing her, and asking her to engage in sexual conduct. The evidence demonstrates Appellant entered Harding's house without permission, badgered her and attempted to engage in physical conduct. Harding testified she was concerned and uncomfortable with Appellant's behavior, believing he was stalking her.
{¶ 54} Appellant's assigned error is overruled.
Tampering With Evidence
{¶ 55} Appellant was convicted of tampering with evidence, in violation of R.C. 2921.12, which reads,
(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation;
{¶ 56} On June 11, 2014, Margaret Konczak attempted to steal a grill from a Kroger store in order to purchase heroin. Appellant arrested Konczak and took her to the jail. Tr. at 114. While awaiting processing, Appellant and Konczak engaged in conversation wherein Konczak admitted to an addiction with heroin. Appellant began flirting with her. Tr. at 114.
{¶ 57} At the jail, Officer Hout processed Konczak and inventoried her possessions. During the inventory search, a small envelope containing a piece of paper with a heroin rock inside was found in Konczak's possessions. Konczak estimated the rock to be about twenty dollars' worth of heroin. The processing officer began an investigation. Sargent Young ordered Appellant return to the jail to collect the heroin. Appellant then approached Konczak and quietly told her if she contacted him upon her release, he would make the heroin go away. Konczak testified at trial,
Officer Garn came into my jail cell and he says, Whose is this? And he said it was in the flowered bag, which it was mine. I said the flowered bag was mine but I didn't know that I had it in there. He basically looked at me and said, If you get ahold of me when you get out of here, this goes away.
Tr. at 116
{¶ 58} Konczak testified she believed Appellant was hitting on her and attracted to her. She was never charged with possession of heroin or conveyance. She also never contacted Appellant again. Id.
{¶ 59} Appellant testified at trial he contacted METRICH detectives with regard to Konczak and the substance at issue in order to conduct an investigation. He field tested the rock found in Konczak's belongings, and the field test came back negative. He then discarded the substance, believing it to be a cutting agent used for heroin. He testified he never heard of a false-negative field test; therefore, did not want to waste time and space. Tr. at 1117. He also testified he never heard from Konczak again. Id.
{¶ 60} Officer Mike Napier of the Mansfield Police Department testified in March of 2014, the officers of the department were told to discontinue field testing. Tr. at 783. He further testified any evidence acquired at the jail could not be thrown away, and had to be sent to the crime lab. Id.
{¶ 61} Anthony Tambasco Director of the Mansfield Police Department forensic science laboratory testified, in March of 2014, he emailed the officers of the department, *122 advising the officers to avoid handling heroin as the substance could contain fentanyl. He stated the officers should discontinue field testing of drugs. Tr. at 183. Testimony at trial demonstrates the officers were to send the substance to the laboratory irrespective of the field test results. Tr. at 493.
{¶ 62} Viewing the evidence in a light most favorable to the prosecution, we find the jury did not lose it's a way in finding the essential elements of tampering with evidence proven beyond a reasonable doubt.
{¶ 63} Appellant's assigned error is overruled.
III.
{¶ 64} In the third assignment of error, Appellant argues the trial court erred in prohibiting evidence as to a witness' prior false allegation of sexual assault.
{¶ 65} Krystal Sawyer testified at trial Appellant came to her home to investigate the theft of socks from Family Dollar. She testified Appellant indicated he would not proceed with the investigation, if she performed sexual acts. Sawyer testified she engaged in fellatio with Appellant, so she wouldn't have to go to jail.
{¶ 66} At trial, Appellant sought to introduce evidence Sawyer previously plead guilty to making a false allegation of sexual assault while in prison. The trial court conducted a voir dire interview of Sawyer, and excluded the evidence.
{¶ 67} Evidence Rule 608(B) provides,
(B) Specific Instances of Conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
{¶ 68} In State v. Boggs, 63 Ohio St.3d 418, 588 N.E.2d 813 (1992), the Ohio Supreme Court held,
False accusations, where no sexual activity is involved, do not fall within the rape shield statute. Therefore, a defendant is permitted under Evid.R. 608(B), in the court's discretion, to cross-examine the victim regarding such accusations if "clearly probative of truthfulness or untruthfulness." However, the defendant will be bound by the answers given by the victim. See, e.g., State v. Gardner, supra, 59 Ohio St.2d [14] at 19, 13 O.O.3d [8] at 11, 391 N.E.2d [337] at 341 [ (1979) ]. Thus, if defense counsel inquires of an alleged rape victim as to whether she has made any prior false accusations of rape, and the victim answers no, the trial court would have the discretion to determine whether and to what extent defense counsel can proceed with cross-examination. However, if the alleged victim answers in the affirmative, the trial court would have to conduct an in camera hearing to determine whether sexual activity had been involved. If the trial court determined that the accusations were entirely false (that is, that no sexual activity had been involved) the trial court would then be permitted to exercise its discretion in determining whether to permit defense counsel to proceed with cross-examination of the alleged victim. We therefore hold that where an alleged rape victim *123 admits on cross-examination that she has made a prior false rape accusation, the trial judge shall conduct an in camera hearing to ascertain whether sexual activity was involved and, as a result, would be prohibited by R.C. 2907.02(D), or whether the accusation was totally unfounded and therefore could be inquired into on cross-examination pursuant to Evid.R. 608(B).
But, as noted above, under no circumstances would the defense be permitted to introduce extrinsic evidence. Evid.R. 608(B). The reason for this is that "a witness may not be impeached by evidence that merely contradicts his testimony on a matter that is collateral and not material to any issue in the trial." Byomin v. Alvis (1959), 169 Ohio St. 395, 396, 8 O.O.2d 420, 421, 159 N.E.2d 897, 989 [898]. Moreover, we held in State v. Kamel (1984), 12 Ohio St.3d 306, 12 OBR 378, 466 N.E.2d 860, at paragraph two of the syllabus, that "[o]ther than the Evid.R. 609 exception for certain criminal convictions, a witness' credibility may not be impeached by extrinsic proof of specific instances of his conduct. Such conduct may be inquired into only by the intrinsic means of cross-examination within the guidelines set forth in Evid.R. 608(B)."
{¶ 69} Unless the party offering the evidence demonstrates that "the accusations were totally false and unfounded" and that no sexual activity took place, the rape shield law bars further inquiry. Id. at 423, 588 N.E.2d 813.
{¶ 70} During the trial proceedings, the following exchange occurred on the record, outside of the presence of the jury,
MS. CORRAL: Yes, Your Honor. We have a record from the institution that she was charged with a violation for making a false report of sexual assault. She did plead guilty to that violation. There's a notation in here that she admitted to fabricating the allegation. We understand that we can't get into whether or not sexual contact occurred, and we have no interest in getting into that. Rape shield protects that, and we respect that boundary. But I do believe or think we should be permitted to inquire as to whether this false allegation actually occurred.
* * *
THE COURT: I did some research on this prior, because I knew this was going to be an issue. What I found was there's a couple cases, State v. Cheney and State v. Boggs , and Evidence Rule 608 B. Evidence Rule 608 B and the case law I found says the defense can ask about a prior false allegation of rape, or something like that, but they would be stuck with the answer if the victim denied it. So if the victim said, I never made a false allegation, you're not going to be able to bring in extrinsic evidence of it.
If she does admit it and says yes, I did make a false allegation, the Court's supposed to determine if any sexual activity actually did occur. Because if there was sexual activity, again, we've got rape shield law that would block that. But if there was no sexual activity at all, then I think she can be crossed on it, but no extrinsic evidence can be introduced. So in other words, you ask the question, but you can't use the RIB information to support it.
So what's going to have to happen is we're going to have to talk to her outside the presence of the jury. We're going to have to ask her if she ever had made it. Again, if she denies it, I believe you're stuck with that answer. If she says, yes, I made a false sexual-made a false allegation, then we need to know if there was any sexual activity that occurred *124 at all. If the answer is no, she just made it up, then you can cross on it. But, again, you can't bring in extrinsic evidence to prove that.
* * *
THE COURT: Krystal, go ahead and have a seat. I'm Judge Brent Robinson. Before you testify, there's a couple things I have to ask you to make a ruling on whether or not you can be asked some questions when you're testifying. There's a question about whether or not you ever made a false allegation. I think this relates to when you were in prison, whether you ever made a false allegation that some sexual activity happened with you and another inmate. So the question will be, did you-have you made a prior allegation like that that wasn't true?
MS. SAWYER: No.
THE COURT: Okay. So the allegation or what you said happened in prison, you-let me back up. You said something happened in prison as far as there was a sexual-
MR. SIDDIQ: Your Honor, I'm sorry, based on the Court's own ruling, I think at the point that she answers no, I think we're done with this hearing.
THE COURT: I want to just clarify that she understands what I'm saying. I would agree with what you're saying.
So you're saying that what happened in the prison, you said something happened, that that really did happen? There was a sexual assault that did happen in the prison?
MS. SAWYER: No.
THE COURT: It did not happen.
MS. SAWYER: No.
THE COURT: Okay. So you said it happened, but it really didn't.
MS. SAWYER: There was more to the story, but-
THE COURT: Let me ask you this: Was there any sexual activity that occurred at all?
MS. SAWYER: Yes.
THE COURT: So there was, in fact, sexual activity that occurred between you and this other person.
MS. SAWYER: Yes.
Tr. at 442-443; 444-445; 448-449.
{¶ 71} We note, Appellant introduced the evidence under seal. Based upon the Ohio Supreme Court's holding in Boggs , we find the trial court did not error in excluding the evidence. During voir dire, Sawyer testified she had not falsified any accusations; rather, "there was more to the story." Sawyer further testified sexual conduct did occur. Pursuant to the case law cited, the evidence is barred by the rape shield statute.
{¶ 72} The third assignment of error is overruled.
{¶ 73} Appellant's convictions entered by the Richland County Court of Common Pleas are affirmed.
Delaney, P.J. and Gwin, J. concur

We note the lengthy procedural history in this case as outlined in the State's brief to this Court and the record on appeal. For purposes of resolution of this appeal, we have limited our discussion and restatement of the procedural history to those pleadings at issue on appeal.

A comprehensive rendition of the facts pertaining to each assigned error is found in the discussion as to each argument, and we limit our recitation of facts to those issues raised on appeal.

Prior to trial, the State dismissed counts 7-8 for violation of the LEADS statute, counts 18-21 for dereliction of duty, and count 36 for menacing by stalking, which count was later indicted in 2015 CR 637. Following the presentation of the State's case, the trial court granted Appellant's motion for acquittal as to Count 35, attempted sexual battery.

Appellant was found not guilty of three counts of violation of the LEADS statute [counts 1, 2 and 4]; not guilty of one count of dereliction of duty [count 30]; and not guilty of burglary [count 32], trespass [count 33], attempted gross sexual imposition [count 34], and public indecency [count 40].

For purposes of the within appeal, we summarily discuss Appellant's sentence imposed by the trial court, as Appellant has not assigned error with regard to the sentence imposed.

Appellee notes several appellate courts have held the failure to renew the motion after the State's case waives the issue on appeal. We elect to address the merits of Appellant's argument based upon the record as it existed at the time the trial court issued its ruling.

Johnson was convicted of unauthorized access to a computer, computer system or network, in violation of R.C. 2913.04(B), as a maintenance manager at a sewer treatment plant. The Eighth District held the statute "clearly and reasonably" apprises persons of ordinary intelligence it is unlawful to store data in or use a computer, when one is without or beyond the express or implied consent of the owner or without a reasonable, though mistaken, belief one has authorization.

Appellant maintains his convicts for dereliction of duty are against the manifest weight and sufficiency of the evidence, because those counts are based upon the LEADS violations.

We assume the dates of each count correspond to the dates listed in the Bill of Particulars. Count One- 6/5/2012; Count Two- 12/8/2012; Count Three- 3/25/2013; Count Four 4/12/2013; Count Five- 8/19/2013; and Count Six- 7/26/2013. The jury returned a verdict of not guilty on counts One, Two and Four.

The traffic stop lead to one valid search of the LEADS system for which Appellant was not indicted.

Appellant admitted on cross-examination his motorcycle permit did not allow him to drive the motorcycle at night, and it was dark at the time he stopped at Harding's residence. Tr. at 277.