[Cite as *State v. Garn*, 2019-Ohio-1604.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. John W. Wise, J. |
| Plaintiff-Appellee | : | Hon. Craig R. Baldwin, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 18CA71 |
| MICHAEL L. GARN | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |

CHARACTER OF PROCEEDING:     Criminal appeal from the Richland County
                             Common Pleas Court, Case No. 15-CR-197

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      April 29, 2019

APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant

GARY BISHOP                           ALLISON HIBBARD
PROSECUTING ATTORNEY                  1200 West 3rd St.
BY: JOSEPH SNYDER                     Cleveland, OH 44113
ASSISTANT PROSECUTOR
38 South Park Street
Mansfield, OH 44902

*Gwin, P.J.*

{¶1} Defendant-appellant Michael Garn ["Garn"] appeals the July 17, 2018 Judgment Entry of the Richland County Court of Common Pleas denying his petition for post-conviction relief [hereinafter, "*PCR petition*"] after an evidentiary hearing.

*Facts and Procedural History*

{¶2} Garn was employed as a police officer with the Mansfield Police Department. A jury convicted Garn on numerous counts including: unauthorized use of LEADS, dereliction of duty, tampering with evidence, sexual battery and menacing by stalking. We affirmed Garn's convictions and sentences. *See, State v. Garn*, 5th Dist. Richland Nos. 16CA26, 16CA31, 2017-Ohio-2969, 91 N.E.3d 109. [Hereinafter, "*Garn, I*"]. The Ohio Supreme Court declined to review Garn's case. *See, State v. Garn*, 152 Ohio St.3d 1406, 2018-Ohio-723, 92 N.E.3d 878(Table). Garn filed an Application to Reopen pursuant to App. R. 26(B) on or about August 17, 2017 that was overruled on October 12, 2017.

{¶3} On or about September 5, 2017, Garn filed a Petition to Vacate or Set Aside Sentence Pursuant to R.C. 2953.21. Garn's petition for post-conviction relief raised three claims. The first and second claims for relief addressed discovery violations. The first claim for relief asserted that the Richland County Prosecutor's Office failed to provide defense counsel with favorable evidence. The second claim for relief asserted that the state deliberately failed to provide exculpatory materials. In the third claim for relief, Garn argued ineffective assistance of trial counsel, Ms. Corral, with regard to her failure to interview a material witness, Brandy Vance.

**{¶4}** Prior to the hearing on Garn's PCR petition and in the hearing itself, the state introduced two exhibits and Garn introduced twenty. Garn's Exhibits 3, 4, 5, 6, 10, and 16 were not admitted into evidence, as they were unauthenticated affidavits. The parties stipulated that Garn's Exhibits 7, 12, 13, 14, and 15 came from the Richland County Prosecutor's Office pursuant to a public records request. (2PCR T. at 2621). There was also a stipulation that Garn's Exhibits 1, 8, 9, and 11 came from the Mansfield Police Department pursuant to a public records request. (2PCR T. at 262-263). Finally, state's Exhibit 1 came from the FBI. (2PCR T.at 168-169). As noted by the trial court,

> A full hearing was held on the matter. Two hours of testimony was heard on January 17, 2018 and then three more days of testimony was heard on March 14, 15, and 16, 2018. The parties were then granted sixty days to submit written closing arguments.

*Judgement Entry Overruling Petition For Post-Conviction Relief*, filed July 17, 2018 at 1. [Hereinafter referred to as "*PCR Judgment Entry*"].

**{¶5}** On or about May 16, 2018 the state filed a post-hearing brief. Garn filed his post-hearing brief on or about May 29, 2018.

**{¶6}** The trial court overruled Garn's petition on or about July 17, 2018. The judgment entry contained 28 findings of fact, and 42 pages of conclusions of law.

*ASSIGNMENT OF ERROR*

**{¶7}** Garn raises one assignment of error,

---

[1] For clarity sake, the transcript of the hearing on Garn's PCR petition will be referred to by volume and page number as "PCR T." and the Transcript of the jury trial will be referred to by volume and page number as "T."

{¶8} "I. THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING PETITIONER'S PETITION FOR POST CONVICTION RELIEF."[2]

**STANDARD OF APPELLATE REVIEW - POST-CONVICTION RELIEF.**

{¶9} R.C. 2953.21(A) states in part,

(A)(1)(a) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States… may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.

{¶10} Although designed to address claimed constitutional violations, the post-conviction relief process is a civil collateral attack on a criminal judgment, not an appeal of that judgment. *State v. Calhoun*, 86 Ohio St.3d 279, 281, 714 N.E.2d 905(1999); *State v. Steffen*, 70 Ohio St.3d 399, 410, 639 N.E.2d 67(1994). A petition for post-conviction relief, thus, does not provide a petitioner a second opportunity to litigate his or her conviction, nor is the petitioner automatically entitled to an evidentiary hearing on the petition. *State v. Jackson*, 64 Ohio St.2d 107, 110, 413 N.E.2d 819(1980). *State v. Lewis*, 5th Dist. Stark No. 2007CA00358, 2008-Ohio-3113 at ¶ 8.

{¶11} In *State v. Gondor*, the trial court held an evidentiary hearing on the petition for post-conviction relief. Id. at ¶19. The Supreme Court noted,

---

[2] *Merit Brief For Appellant*, filed Nov. 20, 2018 at 1.

A de novo review by appellate courts would relegate the postconviction trial court to a mere testimony-gathering apparatus. Nothing in R.C. 2953.21 indicates that that should be the case.

112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 56.  The court in *Gondor* held,

The court of appeals erred by using a de novo standard of review in reversing the trial court's findings. We hold that a trial court's decision granting or denying a post-conviction petition filed pursuant to R.C. 2953.21 should be upheld absent an abuse of discretion; a reviewing court should not overrule the trial court's finding on a petition for post-conviction relief that is supported by competent and credible evidence.

112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 58. An abuse of discretion can be found where the reasons given by the court for its action are clearly untenable, legally incorrect, or amount to a denial of justice, or where the judgment reaches an end or purpose not justified by reason and the evidence.  *Tennant v. Gallick*, 9th Dist. Summit No. 26827, 2014-Ohio-477, ¶35; *In re Guardianship of S.H.,* 9th Dist. Medina No. 13CA0066–M, 2013–Ohio–4380, ¶ 9; *State v. Firouzmandi*, 5th Dist. Licking No.2006–CA–41, 2006–Ohio–5823, ¶54.

**The *Brady* Claims**.

**{¶12}** Garn argues the trial court abused its discretion because  the prosecution's failure to disclose the material attached to his Petition and presented during the evidentiary hearing on that petition violated the United States Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**{¶13}** In *Youngblood v. West Virginia*, the United States Supreme Court summarized,

A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused. See 373 U.S., at 87, 83 S.Ct. 1194. This Court has held that the *Brady* duty extends to impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and *Brady* suppression occurs when the government fails to turn over even evidence that is "known only to police investigators and not to the prosecutor," *Kyles*, 514 U.S., at 438, 115 S.Ct. 1555. See id., at 437, 115 S.Ct. 1555 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,'" *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (quoting *Bagley, supra*, at 682, 105 S.Ct. 3375 (opinion of Blackmun, J.)), although a "showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," *Kyles*, 514 U.S., at 434, 115 S.Ct. 1555. The reversal of a conviction is required upon a "showing that the favorable evidence could reasonably be taken to put the whole

case in such a different light as to undermine confidence in the verdict."

Id., at 435, 115 S.Ct. 1555.

547 U.S. 867, 869-870, 128 S.Ct. 2188,165 L.Ed.2d 269(2006).

**Recanted Testimony.**

{¶14} Courts have noted, "'[r]ecantation by a significant witness does not, as a matter of law, entitle the defendant to a new trial.'" *Hysler v. Florida,* 315 U.S. 411, 413, 62 S.Ct. 688, 86 L.Ed. 932(1942) ("In this collateral attack upon the judgment of conviction, the petitioner bases his claim on the recantation of one of the witnesses against him. He cannot, of course, contend that mere recantation of testimony is in itself ground for invoking the Due Process Clause against a conviction."); *State v. Covender*, 9th Dist. Lorain No. 07CA009228, 2008–Ohio–1453, ¶ 12, *quoting State v. Walker*, 101 Ohio App.3d 433, 435, 655 N.E.2d 823 (8th Dist.1995). Implicit in these standards is the fact that trial courts must evaluate credibility in deciding the motion. If trial courts could not evaluate the credibility of recanted testimony, every recantation after trial would result in a new trial.

{¶15} The United States Supreme Court has observed,

Recantation testimony is properly viewed with great suspicion. It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction. For these reasons, a witness' recantation of trial testimony typically will justify a new trial only where the reviewing

judge after analyzing the recantation is satisfied that it is true and that it will "render probable a different verdict."

*Dobbert v. Wainwright*, 468 U.S. 1231, 1233–34, 105 S.Ct. 34, 82 L.Ed.2d 925 (1984) (Brennan, J*., dissenting from denial of certiorari*). Recanting witnesses are viewed with extreme suspicion. *United States v. Willis*, 257 F.3d 636, 645 (6th Cir.2001).

**A. Garn's Petition and Supporting Evidence.**

**{¶16}** Nine documents submitted by Garn in support of his petition for PCR were admitted during the hearing.

*1). Exhibit 1 – From Lt. Petrycki, Nov. 24, 2014.*

**{¶17}** Garn's Exhibit One is a one-paragraph summary, typewritten on plain paper by Lieutenant Joseph Petrycki. (2 PCR T. at 249-250). The exhibit provides,

**{¶18}** November 24, 2014-0430

On November 24, 2014 at approximately 0430 hours I was informed by the PSCC that CO Lapeer called in requesting to speak to the WC about an officer...I called her several minutes later at which time she told me that an inmate named Crystal [sic.] Sawyer has been telling several people that Officer Garn raped her and that there is a big investigation going on him. She then stated that another female inmate named Maggie Konzack [sic.] was overheard to make the same accusations about Officer Garn; however two of the female trustees (Loretta Chin & Ashley Schriner) overheard Maggie Konzack [sic.] telling Crystal Sawyer that it didn't really happen but that she is saying it to help Crystal's case.

Lt. J.D. Petrycki #202

Garn's PCR Exhibit 1; 1PCR T. at 37. The document was placed in Captain Snavely's inbox, however no follow up investigation into the statements took place and the document was not provided to Garn prior to trial. (2PCR T. at 250; 252 – 253; 255). Captain Snavely could not recall receiving the document. (3PCR T. at 442-445). Garn presented the testimony of Chin and Schriner during the evidentiary hearing on his Petition. (2PCR T. at 219; 4T. at 495).

### a)). Garn's arguments concerning Exhibit One.

{¶19} Garn contends that "[n]ot only could the information have been used to impeach Konczak, but it could have been used in cross-examination of Sawyer." *Merit Brief For Appellant,* filed Nov. 20, 2018 at 26. Garn submits that the testimony of Schriner and Chinn "would cast serious doubt as to both Konczak's credibility as well as Sawyer's." *Merit Brief For Appellant, filed Nov. 20, 2018* at 27(Footnote omitted). Garn submits that the evidence submitted meets the "materiality test" for disclosure set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct,1194, 10 L.Ed.2d 215(1963). *Merit Brief For Appellant, filed Nov. 20, 2018* at 27.

### b)). Competent, credible evidence supports the trial court's decision that non-disclosure of Exhibit One did not violate Garn's due process rights to a fair trial; the impeachment evidence cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

### 1]. Margaret Konczak.

{¶20} In the case at bar, with respect to Margaret Konczak[3], Garn was convicted of Count 31 of the Indictment, Dereliction of Duty and Count 37 of the Indictment, Tampering with Evidence. The Bill of Particulars filed under seal on September 4, 2015 alleged in Count 31 that Garner had been "handed drugs from a Corrections Officer recovered from Margaret Konczak. The defendant failed to log these drugs into evidence." In Count 37 & 38, "Specifically with regard to Margaret Konczak and [A.M.] in disposing of drugs."[4]

{¶21} On June 11, 2014, Margaret Konczak and Brandy Vance attempted to steal a grill from a Kroger store in order to purchase heroin. Garn arrested Konczak and Vance and took them to the jail. (4T. at 114). While awaiting processing, Garn and Konczak engaged in conversation wherein Konczak admitted to an addiction with heroin. Garn began flirting with her. (4T. at 114).

{¶22} At the jail, Correction Officer Hout processed Konczak and inventoried her possessions. During the inventory search of Konczak's purse a prescription pill bottle was found. (4T. at 160). Upon opening the bottle, Hout found "a folded yellow piece of post-it pad paper." (4T. at 160). Inside the paper was "[a] small hard rock of, like, a yellowish color." (4T. at 160). In accordance with established protocol, Hout showed it to Sargent Young. (4T. at 161). Hout then called dispatch to have them send Garn back to the jail. (4T. at 161). When Garn returned Hout handed the substance to Garn. Garn asked to speak to Konczak so Hout opened the cell door. (4T. at 163). Konczak

---

[3] Margaret Konczak passed away before the evidentiary hearing on Garn's PCR petition. 3PCR T. at 336.

[4] The trial court merged Count 31 and Count 37 for sentencing. *Garn, I*, ¶ 7.

testified Garn approached her and quietly told her if she contacted him upon her release, he would make the heroin go away. Konczak testified at trial,

> Officer Garn came into my jail cell and he says, Whose is this? And he said it was in the flowered bag, which it was mine. I said the flowered bag was mine but I didn't know that I had it in there. He basically looked at me and said, If you get ahold of me when you get out of here, this goes away.

4T. at 116.

{¶23} Garn told Hout he would take the substance back to have it tested. (4T. at 167; 8T. at 1117). However, when Hout spoke to Garn on a later date, Garn told Hout he did not take it to the crime lab because Garn was sure it was baking soda. (4T. at 164).

{¶24} Garn testified at trial he may have used "psychological factors" that could be misinterpreted as flirting in order to get a suspect to become an informant. (8T. at 1110; 1169-171). Garn admitted being called back to the jail. (8T. at 1174). Garn admitted talking to Konczak at the door of her cell. (8T. at 1174). Garn admitted that he took the substance and did not turn it into the crime lab. (8T. at 1175). Garn testified that he field tested the substance and the field test came back negative. He then discarded the substance, believing it to be a cutting agent used for heroin. He testified he never heard of a false-negative field test; therefore, did not want to waste time and space. (8T. at 1117). He also testified he never heard from Konczak again. (Id.).

{¶25} Officer Mike Napier of the Mansfield Police Department testified in March, 2014, the officers of the department were told to discontinue field testing. (7T. at 783).

He further testified any evidence acquired at the jail could not be thrown away, and had to be sent to the crime lab. (Id.).

{¶26} Anthony Tabasco, Director of the Mansfield Police Department forensic science laboratory testified, in March, 2014, he emailed the officers of the department, advising the officers to avoid handling heroin as the substance could contain fentanyl. He stated the officers should discontinue field testing of drugs. (4T. at 18). On cross-examination, the following exchange took place,

> [Defense Counsel]: If it tested negative and so it seemed pretty clear to them that it was NutraSweet, or aspartame, or something like that and then they tested it and it came out negative, are you saying that even in that situation there's no discretion on the officer? That everything had to be turned in to your lab?
>
> Tombasco: Yes, they have to turn it all in to the lab.

4T. at 190.

{¶27} Konczak never filed a formal complaint alleging that Garn's had or attempted to have sexual conduct or contact with her. Garn's was not indicted for any alleged sexual advance or crime in which Konczak was the alleged victim. Konczak testified that she never contacted Garn after she was released from jail. (4T. at 120). She never heard from Garn again. (4T. at 133). When asked why she had come forward, Konczak testified

> I just spoke with another female that was telling me a story about Officer Garn. And it really kind of broke my heart, and I didn't want her to

go through it alone.  So she asked if she could tell my story, and I told her yes. I don't have anything to hide.

4T. at 121-122.

{¶28}  The evidence presented at the hearing on Garn's PCR petition, if believed, showed that Konczak might have lied to the inmates.  Shortly thereafter Konczak had compunction of conscience, an awareness of the wrongfulness of lying. (2PCR T. at 231).  She was repentant and immediately confessed her lies to those whom she had told.  Both, Chinn and Shriner testified that Konczak was very upset and crying when she confessed that she had lied. (2 PCR T. at 213; 234; 4PCR T. at 497; 504).  In contrast, Konczak never recanted the allegations that she made during her trial testimony.

{¶29}  Aside from the multiple layers of hearsay contained in both the exhibit and the testimony of Chinn and Schriner, the impeachment evidence as suggested by Garn does nothing to impeach or call into question the testimony presented at trial that Garn failed to submit the heroin to the crime laboratory for analysis.  The jury heard Garn testify that he field tested the substance. Because he determined that the substance tested negative, he took it upon himself to throw it away and not charge Konczak.  By contrast, Special Agent Bryan Seamour from the FBI testified that Garn never mentioned during his interview with the FBI that he had conducted a field test of the substance removed from the pill bottle found in Konczak's purse by Corrections Officer Hout.  (4T. at 213; 216).  Apparently, the field test had been done in solitude as no other witness testified to seeing the test, the results or the destruction of the evidence. The jury had only Garn's word that the substance has been destroyed.

{¶30} The record contains competent, credible evidence that the proper protocol even when a field test yields a negative result is to submit the substance to the crime laboratory for a definitive analysis. (4T. at 190; 6T. at 619-620; 7T. at 783). The focus was correctly on Garn's actions in disposing of the evidence instead of logging it into evidence and submitting it to the crime lab. There is no credible argument that Konczak could "make up" those allegations.

{¶31} In Garn's direct appeal, we found that,

Viewing the evidence in a light most favorable to the prosecution, we find the jury did not lose it's way in finding the essential elements of tampering with evidence proven beyond a reasonable doubt.

*Garn, I* at ¶62.

{¶32} Whether Konczak told inmates at the jail that she had sexual contact or sexual conduct with Garn in order to get out of jail and subsequently told inmates at the jail that it was untrue, that evidence could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

### *2]. Krystal Sawyer.*

{¶33} Garn also argued that Ms. Schriner and Ms. Chin testified at the hearing as to Krystal Sawyer reputation for untruthfulness around the jail. However, Garn's Exhibit One does not state that Krystal Sawyer said she made up the allegations[5]. There is nothing about Krystal Sawyer in the memorandum other than that she was telling people that Garn had raped her and there was a big investigation into the allegation. She told Garn's trial attorney and Garn's private investigator the same

---

[5] Krystal Sawyer's statements are dealt with in more detail in our disposition of Garn's Exhibit Seven and Exhibit 8, *infra.*

details almost one year before the trial began in Garn's case. (1 PCR T. at 78; State's Exhibit 2). In addition, Ms. Shriner testified that she never heard Ms. Sawyer say that she was lying or ever heard of anything to indicate that she was lying. (2PCR T. at 230-231).

{¶34} Assistant prosecutor Omar Siddiq testified that he talked with Krystal Sawyer a little bit about whether she recanted and how and what was going on. (3PCR T. at 327-328). When asked if Sawyer took back her allegations, Siddiq testified that,

> Ultimately, no. She stuck with it. We had to have a long conversation about what took place and why that took place and told her that she would have to explain that on the stand and ultimately the jury would have to believe that she did that just to change her bond or not.

3PCR T. at 328.

{¶35} Garn's counsel questioned Ms. Sawyer about her attempt to recant her allegations at trial. (6T. at 480). However, as Ms. Sawyer testified at trial her threatened recantation was because she believed her $100,000 bond on a felony of the fifth-degree was a direct result of her allegations against Garn and she thought recanting would allow her to get out of jail. (6T. at 478-480).

{¶36} Trial counsel for Garn and private investigators hired by Garn met with Sawyer June 4, 2015[6]. (1PCR T. at 78; State's Exhibit 2). Sawyer reiterated the details of her encounter with Garn during that interview. (State's Exhibit 2). Her testimony at trial was consistent with those details. In addition, Sawyer told counsel and the

---

[6] Garn's jury trial commenced on April 4, 2016 and continued through April 14, 2016.

investigators that "she might have told people that she made this all up but she did not". (1PCR T. at 78-79; State's Exhibit 2).

{¶37} In *State v. Ketterer*, the Ohio Supreme Court found,

Even assuming that Ketterer was entitled to such information, Ketterer knew about most of this information before his resentencing hearing. *See State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 28, fn. 2 (no *Brady* violation occurs where a defendant knows of essential facts permitting him to take advantage of exculpatory information or where evidence is available from another source), *citing United States v. Clark* (C.A.6, 1991), 928 F.2d 733, 738; *see also State v. Iacona* (2001), 93 Ohio St.3d 83, 100, 752 N.E.2d 937, *quoting United States v. Smith Grading & Paving, Inc.* (C.A.4, 1985), 760 F.2d 527, 532 (" 'No due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial' ").

126 Ohio St.3d 448, 2010-Ohio-3831, 935 N.E.2d 9, ¶ 36.

{¶38} Accordingly, based upon the foregoing, the trial court did not abuse its discretion in finding that the state's failure to disclose the evidence set forth in Garn's Exhibit One and presented at the evidentiary hearing was not a *Brady* violation. The impeachment evidence as presented by Garn cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

{¶39} Garn was not denied his right to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

*2). Exhibit 7 – letter to the FBI from then Richland County Prosecutor Bambi Couch-Page.[7]*

**{¶40}** Garn's Exhibit Seven is a letter dated July 22, 2015 that purports to be to the FBI from then Richland County Prosecutor Bambi Couch-Page. It appears to be in response to a "*Touhy*" request for the testimony of Agent Fisher.[8] (PCR Exhibit 18).

**{¶41}** The state entered into a stipulation that "Defendant's Exhibit 7 [the FBI draft letter] was created by Miss Couch-Page or at her direction." (4PCR T. at 421-422).

### a)). Garn's arguments concerning Exhibit Seven.

**{¶42}** Garn contends, "the state was aware of or in possession of, a number of interviews in which the witnesses failed to inculpate Mr. Garn. This is evidenced by the FBI Draft letter authored by Bambi Couch Page. Further, a January 15, 2015 report by Lt. Petrycki states that 'Detective Deitrich contacted me after her meeting with Krystal Sawyer. The report indicates that on or about January 15, 2015 Sawyer was contacted regarding her allegations against Mr. Garn. No such statement or summary was turned over to the defense. (PC Exhibit 6)." *Merit Brief For Appellant*, filed Nov. 20. 2018 at 9.

**{¶43}** Garn further argues, "The FBI draft letter provided through a public records request indicates that favorable evidence was withheld by the state. It is the contents of the FBI letter authored by Couch Page that violate both *Brady* and *Napue* as the letter evidences an awareness of 'multiple interviews" which included admissions by witnesses that they "lied." (PC Exhibit 7). Additionally, it notes that there

---

[7] Garn's Exhibits 2 through 6 were affidavits that were not offered into evidence during the PCR hearing.
[8] *U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed.417 (1951).

were multiple "version of events" provided to law enforcement. The letter also states that "upon first interview, many of the witnesses were reluctant to provide any sort of inculpating information involving the defendant's criminal conduct." Id. The state supplied one inculpatory interview from each witness victim and withheld any and all interviews or summaries where witnesses/victims refused to inculpate Mr. Garn and/or provided a different version of events. *Kyles* is clear that due process requires disclosure of evidence that provides grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation to impeach the credibility of the state's witness or to bolster the defense's case against prosecutorial attacks. 534 U.S. at 445-446." *Merit Brief For Appellant*, filed Nov. 20, 2018 at 28

*b)). Competent, credible evidence supports the trial court's decision that non-disclosure of Exhibit Seven did not violate Garn's due process rights to a fair trial; the evidence cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.*

**{¶44}** Garn's Exhibit 7 is not substantive evidence that *Brady* material exists. The record contains competent, credible evidence that the letter was never signed and mailed to the FBI. (4PCR T. 533). The record contains competent, credible evidence that the letter was a draft, a work-in progress. (4PCR T. at 533-534; 536; 538).    This is evidenced by the typographical errors as for example,

July 22, 2015

Federal Bureau of Investigation

**FIRST NAME??** Curtis

Associate Division Counsel

And, also,

**WRITE A DESCRIPTION OF AGENT FISHER'S INVOLEMENT AND EXPLAINT WHY WE NEED HIS TESTIMONY**

{¶45} None of the facts in the letter appear to be representative of the facts of Garn's case. Assistant Prosecutor at the time Clifford Murphy testified that the language appeared to have been taken from a previous case involving human trafficking in which the prosecutor's office had recently sent a *Touhy* letter to the FBI. (4PCR T. 533-537).

{¶46} Assistant Prosecutor at the time Clifford Murphy testified that he spoke with either Special Agent Fisher or Seamour and asked if the FBI did anything else in Garn's case, to which the agent replied, "No." (4PCR T. at 539-540).

{¶47} The record contains competent, credible evidence that the FBI turned over all exculpatory evidence in its possession to the prosecutor's office, who in turn gave it to defense counsel in Garn's case. State's Exhibit One is a letter from Special Agent Gregory Curtis stating that the FBI "provided all relevant information related to the Michael Garn investigation (including but not limited to *Brady, Jencks*, or *Giglio* material)." This document was given to defense counsel. (4PCR T. at 539).

{¶48} Special Agent Bryan Seamour testified during Garn's jury trial. Seamour testified that he and Special Agent Grady Fisher conducted a tape-recorder interview of Garn. (4T. at 206). Seamour did not testify that he or Special Agent Grady had interviewed any other witness. A transcript of the interview was given to defense counsel.

{¶49} With respect to Krystal Sawyer, Assistant Prosecutor at the time Omar Siddiq testified that he met with Krystal Sawyer when she was incarcerated in order to prepare for Garn's upcoming trial. (3PCR T. at 326). Sawyer never indicated that she had been interviewed by the FBI to Siddiq. (3PCR T. at 326). He further testified to the best of his knowledge, the only person the FBI interviewed was Garn. (3PCR T. at 326-327). Around January 8, 2015, Sawyer had been arrested and taken to jail. (3T. at 368). Siddiq testified that Sawyer threatened to recant her allegations because Sawyer believed that her bond in the new case was set too high. (3PCR T. at 327). She believed it was because of her involvement in Garn's case. (3PCR T. at 328-329). Siddiq believed that Sawyer would testify truthfully at trial. (3PCR T. at 342).

{¶50} Lieutenant Joy Stortz testified that she spoke to Sawyer in reference to Sawyer overdosing on drugs. (3PCR T. at 366-367). The meeting did not occur in the jail. (3PCR T. at 367). Nor did Lt. Stortz take a statement from Sawyer in preparing her report dated January 8, 2015. (3PCR T. at 369; 380; Garn's Exhibit 8).

{¶51} Lieutenant Chad Brubaker testified that he met with Sawyer at the jail to investigate whether Sawyer wanted to recant her allegations against Garn. (3PCR T. at 429-430). Sawyer was upset and threatening to recant because her bond was so high. (3PCR T. at 432). Lt. Brubaker specifically testified,

{¶52} But then I flat out asked her myself. I said, are you telling – are you telling anybody that you're lying, that you lied about a statement that you had given? And she said, "No, I told the truth."

3PCR T. at 431. Lieutenant Brubaker further testified,

She didn't want to recant her story. If she would have told me, no, I didn't tell the truth in that statement, then we would have took [sic.] a second statement from her then.

3PCR T. at 434. Finally, Lieutenant Brubaker testified,

Q. And did you say anything to convince her not to change her story? Did you tell her – well, strike that.

You explained to Krystal Sawyer that you could do nothing about her bond. Is that correct?

[Lt. Brubaker]: Correct.

Q. And at that point, did Krystal Sawyer say that she had been telling the truth?

[Lt. Brubaker]: Yes. I asked her, and she said she had told the truth.

3PCR T. at 435.

{¶53} State's Exhibit 2 is an Interview Summary prepared by the Lycurgus Group, LLC, the private investigators that were hired by Garn. An investigator, Michael Taylor, met with Krystal Sawyer at the Marysville Reformatory for Women on June 4, 2015. Sawyer told Taylor the same allegations she had made concerning Garn when describing for Taylor what Garn had done to her. (State's Exhibit 2). Importantly, Taylor noted, "Krystal said she might have told people she made this all up but she did not." (State's Exhibit 2). Garn's trial counsel admitted she was present during the interview of Krystal Sawyer on June 4, 2015. (1PCR T. at 53; 78).

{¶54} Further, Defense Counsel inquired into Sawyer's recantation during Garn's trial,

[**Ms. Corral**]: At a later date, did you tell a corrections officer that you tried to recant your story but they wouldn't let you?

[**Sawye**r]: No. I wanted to recant because I was in there on a felony five and my bond was $100,000. I thought that's the reason why I was in jail for – I couldn't get a good bond that I could pay because—

[**Ms. Corral**]: Okay. But the question is, did you tell a corrections officer that you tried to recant?

* * *

[**Ms. Corral**]: My follow-up is, did you tell a corrections officer that you wanted to recant?

[**Sawyer**]: Yes.

* * *

[**Prosecutor Siddiq**]: And the one time, as defense counsel says, that you asked to recant your statement was because you were in jail?

[**Sawyer**]: Yes.

[**Prosecutor Siddiq**]: Why did you feel recanting would help you?

[**Sawyer**]: Because I thought that he was cool with everybody up here, so I thought maybe if I told them that it didn't happen, that maybe they would lower my bond.

[**Prosecutor Siddiq**]: Because you wanted to get out.

[**Sawyer**]: Yes.

[**Prosecutor Siddiq**]:   And you thought that recanting your story would help you.

[**Sawyer**]:  Yes.  Get out of jail.

[**Prosecutor Siddiq**]:   Did you want to recant because it didn't happen?

[**Sawyer**]:  No.

[**Prosecutor Siddiq**]:   Did you want to recant because you were making it up?

[**Sawyer**]: No.   I wanted to get out because I missed my kids.   I didn't understand why my bond was so high.  Even the CO said that they'd never seen that.  And I asked people, Do you know of other inmates?  And they said, Krystal, you know, if you tell them--

**MS. CORRAL**: Objection.

* * *

[**Sawyer**]:    The conclusion I got from, you know, gathering information was that if I said that, you know, it didn't happen -- because I thought it was his friends up here at the courthouse, you know he works with people up here.  So I thought maybe it would help.

**{¶55}**  6T. at 478-480.

**{¶56}**  Chief Kenneth Coontz testified that the only interview the FBI conducted was with Garn. (3PCR T. at 483).

**{¶57}**  We find that the defense was aware nearly one year before the start of Garn's jury trial that Sawyer might have told people she made this all up but she did

not. *See, State v. Ketterer,* 126 Ohio St.3d 448,2010-Ohio-3831, 935 N.E.2d 9, ¶ 36 ("no *Brady* violation occurs where a defendant knows of essential facts permitting him to take advantage of exculpatory information or where evidence is available from another source." *citing United States v. Clark* (C.A.6, 1991), 928 F.2d 733, 738). We find no credible, substantive evidence that there were multiple witnesses who had attempted to recant, or had lied, or had failed to inculpate Garn.

**{¶58}** We find the record contains competent, credible evidence to support the trial court's decision. The evidence as presented by Garn cannot reasonably be taken in to put the whole case in such a different light as to undermine confidence in the verdict.

**{¶59}** Therefore, the trial court did not abuse its discretion in finding that any failure to provide Garn's Exhibit Seven, or the information contained therein, to the defense was not a *Brady* violation. Garn was not denied his right to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

*3). Exhibit 8 – The "Garn Complaint" authored by Lieutenant Joy Stortz.*

**{¶60}** An incident allegedly occurred around January 8, 2015 and Lt. Stortz noted on January 26, 2015 that the investigation had been closed without charges after the complaining witness could not be located. (3PCR T. 372-373). Garn's Exhibit 8 is one typewritten page. It is on plain paper with no letterhead. It does not contain a signature or a sworn verification.

**{¶61}** The relevant portion of the summary provided that Lt. Stortz was told by J.W. that M.J. called and said that Garn had appeared looking for Krystal Sawyer and

Krystal "is scared to death." M.J. would not name the individual who allegedly told her that Garn showed up at the relative's house. Lt. Stortz determined that Krystal Sawyer was incarcerated in the Richland County Jail. Lt. Stortz contacted Major Masi at the jail and he contacted Detective Stacy Dittrich and requested Detective Dittrich go into the jail and speak with Ms. Sawyer. Lt. Stortz noted that Krystal Sawyer was offered the opportunity to go into protective custody in the jail and that Ms. Sawyer declined the offer at the time.

**{¶62}** Stortz never spoke to Sawyer concerning the events in Garn's Exhibit 8. (3PCR T. at 369).

### a)). Garn's arguments concerning Exhibit Eight.

**{¶63}** Garn's trial attorney "never claimed" that State's Exhibit Eight was "exculpatory." (2PCR T. at 141). Trial counsel argued that the fact that Krystal turned down an offer to go into protective custody was "material." (2 PCR T. at 141). Counsel contended that the Exhibit evidences an interview with Sawyer that was not disclosed. (1PCR T. at 58-59; 62-63). Among Counsel's concerns were, "Why was she given an opportunity to go into protective custody?" and "What was the purpose of that meeting?"(1PCR T. 59).

### b)). Competent, credible evidence supports the trial court's decision that non-disclosure of Exhibit Eight did not violate Garn's due process rights to a fair trial; the evidence cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

**{¶64}** The record contains competent, credible evidence that protective custody while in jail meant being put in "isolation." (2PCR T. at 140; 273; 3PCR T. at 372).

Further, the inmate in protective custody would not have the same level of privileges. (4PCR T. at 541). Accordingly, it is equally credible that a desire not to go into protective custody means Sawyer did not want to be put into isolation or give up her jail privileges.  It does mean Sawyer was not afraid of Garn.  Further, Garn's Exhibit Eight is unclear as to whether Sawyer said she was "scared to death" or whether it was the third party whom was reporting to the officers making this claim.

{¶65}  In *Moore v. Illinois*, the United State Supreme Court noted,

> We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.

480 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 70(1972).

The subject of whether undisclosed statements with Sawyer existed was extensively probed during the four-day evidentiary hearing on Garn's PCR petition. The record contains competent, credible evidence that the state did not fail to disclose evidence materially favorable to Garn with respect to statements made by Sawyer or interviews conducted with Sawyer by law enforcement or the prosecutor's office.  Garn's trial counsel and private investigators personally met and interviewed Krystal Sawyer on June 4, 2015. (PCR T. at 53; 78; State's Exhibit 2[9]).  We find no credible, substantive evidence that there were multiple witnesses who had attempted to recant, or had lied, or had failed to inculpate Garn.

---

[9] Admitted into evidence at 4PCR T. at 604-605.

**{¶66}** Accordingly, based upon the foregoing, the trial court did not abuse its discretion in finding that the state's failure to disclose the evidence set forth in Garn's Exhibit Eight and presented at the evidentiary hearing was not a *Brady* violation. The evidence as presented by Garn cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

**{¶67}** Garn was not denied his right to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

*4). Exhibit Nine – Summary prepared by Officer Rich Miller dated August 25, 2014.*

**{¶68}** Exhibit Nine is one typewritten page. It is on plain white paper without a letterhead. It does not contain a signature. It does not contain a verification. It was authored by Officer Rich Miller and dated August 25, 2014.

**{¶69}** Exhibit Nine discusses a complaint between Ashley Matthews and a doctor. In the document, it is noted that Ashley Matthews accused the doctor of trading sex for prescription medications and alleged that the doctor was as corrupt as Garn. Officer Miller documents that Matthews alleged that Garn had taken heroin and hidden it from her or on her in an effort to coerce her into having sex with him.

### *a)). Garn's arguments concerning Exhibit Nine.*

**{¶70}** Concerning Exhibit Nine, Garn contends, "the state's failure to disclose evidence related to these charges undermines confidence in the outcome of the trial as a whole. The state was in possession of, and failed to produce, evidence that the Matthews had made similar sexual allegations against a Doctor, which were

unfounded. A police report containing the same information was provided through a public records request but not provided prior to trial. MPD Officer Rich Miller testified that he drafted the complaint and turned it over, up the chain of command. (PC Tr. at 422-426)." *Merit Brief For Appellant*, filed Nov. 20. 2018 at 13.

***b)). Competent, credible evidence supports the trial court's decision that non-disclosure of Exhibit Nine did not violate Garn's due process rights to a fair trial; the evidence cannot reasonable be taken to put the whole case in such a different light as to undermine confidence in the verdict.***

**{¶71}** The jury found Garn not guilty of all counts relating to Ashley Matthews. It would be mere speculation that Garn's Exhibit Nine would have had any effect on the remaining charges unrelated to Matthews. It is also speculative as to whether this evidence would have been admissible at his trial.

**{¶72}** We note Garn's re-trial on the Matthews allegations would be barred by the principles of Double Jeopardy, the jury having found him not guilty. Therefore, on any re-trial of the remaining charges, Garn's Exhibit Nine would not be admissible.

**{¶73}** Accordingly, based upon the foregoing, the trial court did not abuse its discretion in finding that the state's failure to disclose the evidence set forth in Garn's Exhibit Nine and presented at the evidentiary hearing was not a *Brady* violation. The evidence as presented by Garn cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. The jury found Garn not guilty with respect to all counts involving Ashley Matthews.

**{¶74}** Garn was not denied his right to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

*5). Exhibits Eleven, Twelve and Thirteen – Relating to STEP Logs; Exhibits Fourteen - email relating to Allie Silliman and Garn's Exhibit Fifteen case supplement prepared by Captain Brett Snavely relating to Jamie Woods.*

**{¶75}** Garn's Exhibit Eleven is an email from Captain Bret Snavely to defense attorney Kimberly Corral sent prior to trial in response to her subpoena for records related to the counts of LEADS violations.  In the email, Captain Snavely indicated that the Select Traffic Enforcement Program (STEP) logs for 2012 no longer existed but that he provided the data that he did have for Garn for 2012, i.e. the dates Garn worked STEP enforcement and how many contacts that Garn made in 2012. The 2013 STEP logs were located.

**{¶76}** Garn's Exhibit Twelve was stipulated as having come from the prosecutor's office in a public records response. It is a single STEP log for Garn from August 2, 2012 regarding the traffic stop for Kimberly McBride.

**{¶77}** Garn's Exhibit Thirteen is a four-page document from the prosecutor's office detailing the LEADs counts including the alleged victim, date of offense, and other information. It indicates that Count Eight for Kim McBride might need to be dismissed as the STEP log indicated a stop and warning issued.  This Exhibit was compiled by a juvenile attorney in the prosecutor's office to help in putting together the Bill Of Particulars and to assist in presenting the case.  4PCR T. at 542-543.

**{¶78}** Garn's Exhibit Fourteen is an email to Patty Masi of the Richland County Prosecutor's Office from Lt. Joy Stortz. The email was sent on March 20, 2015, which was shortly after Garn was indicted in this case on February 26, 2015. In the email, Lt. Stortz states that, "Allie Silliman is the replacement person, she is named in the original complaint that I sent over and you will see her name on most of the paperwork."

**{¶79}** Garn's Exhibit Fifteen is a Case Supplemental Report prepared February 27, 2015. The document indicates that Captain Snavely spoke to Jamie Woods and verified that the LEADs inquiry made on her was associated with a proper traffic stop.

### a)). Garn's arguments concerning Exhibits Eleven, Twelve, Thirteen, Fourteen and Fifteen.

**{¶80}** Garn argues,

Case notes reveal that the prosecution was aware that charges related to Jamie Wood and Kim Vandayberg McBride were not LEADS violations. (PC Exhibits 12-15). The documentation establishes that the investigation revealed that the charges related to Vandayberg and [sic.] McBride[10] were legitimate and well documented traffic stops confirmed by the alleged victims. These documents were favorable, were not turned over, and were material to the violations charged.

Further, Lt. Stortz had expressed to the prosecution that the names which they asked her to investigate as LEADS violations were not LEADS violations. (PC Tr. at 374). Specifically, she indicated that McBride, Jamie

---

[10] It appears from the record that Kim Vandayberg McBride was one person not two separate individuals.

Wood, Sarah Mosier, and Mike Napier were not LEADS violations. (PC Tr. at 384). She testified that she notified them that her interviews resulted in a conclusion that there was not a violation. (PC Tr. at 394-395). Those interviews were not provided to the defense prior to trial. Nor were the supporting documents.

*Merit Brief For Appellant*, filed Nov. 20. 2018 at 13-14.

**{¶81}** *b)). Competent, credible evidence supports the trial court's decision that non-disclosure of Exhibits Eleven, Twelve, Thirteen, Fourteen and Fifteen did not violate Garn's due process rights to a fair trial; the evidence cannot reasonable be taken to put the whole case in such a different light as to undermine confidence in the verdict.*

**{¶82}** Lt. Stortz testified at the post-conviction hearing that she was given a list of names to follow up with regarding the LEADs violations. (3PCR T. at 374). As part of that investigation, she found that some of the original LEADS inquires that were thought to be violations were not. (3PCR T. at 376-377). Lt. Stortz testified that she believed there were violations that she believed should not have been charged. Lt. Stortz found violations involving Allie Silliman that had not been charged as LEADS violations in Garn's case that Lt. Stortz felt should be charged. (3PCR T. art 375-376).

**{¶83}** The state did not follow Lt. Stortz's urging. The state did not charge Garn with any LEADS violation regarding Allie Silliman nor did the state call her as a witness during Garn's trial. (4PCR T. at 547548; 550-553).

**{¶84}** The only counts of the Indictment that occurred in 2012 were Count I, December 8, 2012, Kelly Harding and Count VIII, August 2, 2012, Kim McBride. The

jury found Garn not guilty of Count I. (11T. at 1413). The state dismissed Count VIII before trial. (4PCRT at 544). Count VII concerning Jamie Wood was likewise dismissed by the state prior to trial. (4PCR T. at 544).

{¶85} Sara Moser-Napier testified for the defense during Garn's trial. (8T. at 1013). She testified that she was assigned to the canine unit of the Mansfield Police Department. (8T. at 1020). Officer Moser-Napier worked and is friends with Garn. (8T. at 1014). Garn was not indicted or charged with a LEADS violation with respect to Officer Moser-Napier.

{¶86} Based upon the evidence presented at trial, the jury found Garn guilty of Count XI a LEADS violation involving Mike Napier. (9T. at 1305; 11T. at 1414). *See, Garn, I* at ¶6; ¶33.

{¶87} Competent, credible evidence was presented that no victim was "substituted." The record indicates that Lieutenant Joy Stortz urged the state to "substitute" Allie Silliman for Jamie Woods. (Garn's Exhibit 14; Garn's Exhibit 15; 3PCR T. at 374-377). She further advocated dismissing charges relating to Kim McBride, Sarah Moiser, Mike Napier and Jamie Wood. (3PCR T. at 385). However, the state did not charge Garn with any LEADS violation regarding Allie Silliman nor did the state call her as a witness during Garn's trial. (4PCR T. at 547-548; 550-553).Garn was not indicted or charged with a LEADS violation with respect to Officer Sarah Moser-Napier. The charges relating to Wood and McBride were dismissed before trial. Based upon the evidence presented at trial, the jury found Garner guilty of Count XI a LEADS violation involving Mike Napier. (9T. at 1305; 11T. at 1414). *See, Garn, I* at ¶6; ¶33.

{¶88} Any delay in dismissing Count VII and Count VIII was attributable to the number of attorneys working on the case at any given time. (4PCR T. at 543-544; 553-557). The state further consulted their LEADS expert. (4PCR T. at 550-552). The state further made the LEADS CD/DVD available to the defense prior to trial. That item listed all of Garn's LEAD's searches for the preceding four to five years. (4PCR T. at 545). This would include legitimate and improper uses of the system. (4PCR T. at 567).

{¶89} Accordingly, based upon the foregoing, the trial court did not abuse its discretion in finding that the state's failure to disclose the evidence set forth in Garn's Exhibits Eleven, Twelve, Thirteen, Fourteen and Fifteen and presented at the evidentiary hearing was not a *Brady* violation. The evidence as presented by Garn cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

{¶90} Accordingly, Garn was not denied his right to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution by failing to turn over this evidence. The record contains competent, credible evidence that the state did not act in bad faith in failing to turn over any of the evidence relating to Garn's Exhibit Eleven, Twelve, Thirteen, Fourteen and Fifteen.

*6). Garn's Napue Claims.*

{¶91} Garn also argued that based on *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), his convictions were void and/or voidable. Garn claims that this case stands for the notion that if the prosecutor was informed of the allegedly

favorable materials addressed above, and deliberately failed to provide the evidence to the defense, then Garn's due process rights are violated. *Merit Brief For Appellant*, filed Nov. 20, 2018 at 28-29.

***a)). Competent, credible evidence supports the trial court's decision that the evidence failed to establish that the acts of the state were in "bad faith" or deliberate; the evidence cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.***

**{¶92}** In *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3L.Ed.2d 217(1959), "the principal prosecution witness at Napue's murder trial was an accomplice then serving a sentence for the crime. He testified, in response to an inquiry by the prosecutor, that he had received no promise of consideration in return for his testimony. In fact, the prosecutor had promised him consideration, but he did nothing to correct the witness' false testimony. This Court held that the failure of the prosecutor to correct the testimony, which he knew to be false, denied Napue due process of law, and that this was so even though the false testimony went only to the credibility of the witness." *Moore v. Illinois,* 408 U.S. 786, 797, 92 S.Ct. 2562, 33 L.Ed.2d 706(1972).

**{¶93}** Garn's Exhibit One does not support any inference that the state knowingly used false testimony or knowingly allowed false testimony to go uncorrected.

**{¶94}** The evidence does not show that Konczak's trial testimony was false. Konczak never recanted the allegations that she made during her trial testimony. The impeachment evidence as suggested by Garn does nothing to impeach or call into question the testimony presented at trial that Garn failed to submit the heroin to the

crime laboratory for analysis. Garn himself admitted he did not log the heroin into evidence or submit it to the crime lab.

{¶95} Krystal Stewart never testified inconsistently with her allegations. She never told Chin or Schriner that she had lied about Garn telling her that he would not take her to jail if she had sex with him, or that she performed oral sex on Garn. Stewart told defense counsel and Garn's private investigators the same nearly one year before trial. In addition, Stewart told defense and the private investigators about possibly telling others that she had lied nearly one year before trial. The defense did in fact question her on this subject at trial.

{¶96} Garn's Exhibit Seven does not support any inference that the state knowingly used false testimony or knowingly allowed false testimony to go uncorrected. The document is clearly a draft that was never revised, signed or sent by the state. There is no evidence that Exhibit Seven was ever received by the FBI. As a draft it was subject to revision and editing. Stewart told defense and the private investigators about possibly telling others that she had lied nearly one year before trial. The defense did in fact question her on this subject at trial.

{¶97} The defense questioned Kelly Harding at trial concerning her reluctance to testify and her desire to recant. Harding testified that she was telling the truth.[11] (4T. at 263-264). The defense was aware of Ms. Harding's attempt to recant and cross-examined her on that subject at trial. (4T. at 256-258; 260; 263).

{¶98} There is no evidence that the state failed to provide material evidence concerning any other witness. No affidavits, depositions or testimony from any of the trial witnesses was presented during the hearing on Garn's *PCR petition.*

_____

[11] Kelly Harding is dealt with in more detail at No. 9, infra.

**{¶99}** Garn's Exhibit Eight does not support any inference that the state knowingly used false testimony or knowingly allowed false testimony to go uncorrected. The document was hearsay and the original complainant was never located. The fact that Stewart declined protective custody is not evidence that is vital and material to the issue of guilt or penalty.

**{¶100}** Garn's Exhibit Nine does not support any inference that the state knowingly used false testimony or knowingly allowed false testimony to go uncorrected. The jury found Garn not guilty of all counts relating to Ashley Matthews. It would be mere speculation that Garn's Exhibit Nine would have had any effect on the remaining charges unrelated to Matthews.

**{¶101}** Garn's Exhibits Eleven, Twelve and Thirteen does not support any inference that the state knowingly used false testimony or knowingly allowed false testimony to go uncorrected. The only counts of the Indictment that occurred in 2012 were Count I December 8, 2012, Kelly Harding and Count VIII, August 2, 2012, Kim McBride. The jury found Garn not guilty of Count I. The state dismissed Count VIII before trial. (4PCR T. at 544). Count VII concerning Jamie Wood was likewise dismissed by the state prior to trial. (4PCR T. at 544). Based upon the evidence presented at trial, the jury found Garn guilty of Count XI a LEADS violation involving Mike Napier. (9T. at 1305; 11T. at 1414). *See, Garn, I* at ¶6; ¶33.

**{¶102}** Garn's Exhibits Fourteen and Fifteen do not support any inference that the state knowingly used false testimony or knowingly allowed false testimony to go uncorrected. Garn was never indicted or tried on any allegation concerning Allie Silliman. The state did in fact dismiss the count concerning Jamie Woods before trial.

{¶103} Accordingly, based upon the foregoing, the trial court did not abuse its discretion in finding that the state's failure to disclose the evidence as submitted by Garn in his *PCR petition* and presented at the evidentiary hearing was not a *Brady or a Napue* violation. The evidence as presented by Garn cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. There is nothing in the record to demonstrate that the state presented false testimony, failed to correct false testimony or destroyed evidence in bad faith. In the case at bar we find no evidence that the state's actions were nefarious or underhanded in seeking to double check the allegations and the evidence before deciding to dismiss charges. We find no credible, substantive evidence that there were multiple witnesses who had attempted to recant, or had lied, or had failed to inculpate Garn.

{¶104} Accordingly, Garn was not denied his right to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

*7). Ineffective assistance of counsel – Failure to call Brandy Vance at trial.*

{¶105} Garn argues that the testimony of Brandy Vance contradicted Konczak's trial testimony. *Merit Brief For Appellant*, filed Nov. 20, 2018 at 6. Garn claims Vance testified at the PCR hearing that Garn was not inappropriate and did not make her feel uncomfortable. Vance testified, according to Garn, that she never knew Konczak to keep drugs in her purse. Id. Garn contends that Konczak "only presented her allegations after hearing [Krystal] Sawyer's story…" *Merit Brief For Appellant*, filed Nov. 20, 2018 at 31. Vance was listed as a State's witness in Discovery and Defense Counsel failed to interview her. *Merit Brief For Appellant*, filed Nov. 20. 2018 at 30.

Garn submits this could not be construed as a strategic decision. *Merit Brief For Appellant*, filed Nov. 20. 2018 at 30-31.

**_a)). Competent, credible evidence supports the trial court's decision that the evidence failed to impeach Konczak's testimony in any material respect; the evidence cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict._**

1]. *Ineffective Assistance of Counsel.*

{¶106} A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant.   The second prong is whether the appellant was prejudiced by counsel's ineffectiveness.  *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180(1993); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373(1989).

{¶107} In order to warrant a finding that trial counsel was ineffective, the petitioner must meet both the deficient performance and prejudice prongs of *Strickland* and *Bradley.  Knowles v. Mirzayance,* 556 U.S. 111, 122-123; 129 S.Ct. 1411, 173 L.Ed.2d 251(2012).

{¶108} The United States Supreme Court discussed the prejudice prong of the *Strickland* test,

> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable

probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S.Ct. 2052.

"Surmounting *Strickland'*s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ——, ——, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689–690, 104 S.Ct. 2052. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." Id., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional

norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

*Harrington v. Richter, 562* U.S.86, 104-105, 131 S.Ct. 770, 178 L.Ed.2d 624(2011).

2]. *Brandy Vance testimony does not contradict Konczak's trial testimony.*

**{¶109}** Brandy Vance does not contradict Konczak's testimony that she forgot she had heroin in her purse. Vance testified at the hearing on Garn's PCR petition as follows,

> Q.    Okay. Were you aware that there were drugs in Maggie's purse?
>
> A.    No.
>
> Q.    So as far as you know, there were not drugs in Maggie's purse?
>
> A.    No. Why wouldn't we have done them? I know somebody said that. *I don't know if there was. Maybe she was greedy, putting stuff back. But as far as I knew, no,* because, like, before we walked in, I put my rings and everything in the car. I never walked in a store with them in case we did get caught so I didn't have anything on me. She would do the same. We drove in, and I told him we took the bus because I wasn't having my car searched because there was a lot of stuff in there.
>
> * * *
>
> Q.    Okay. So it's really unlikely that she would have had drugs in her purse?

A.    I mean, I don't think, *but she could have.*  Do you know what I mean?

Q.    Okay.

A.    *Did I watch her put drugs in her purse?  Did I know of them?  No.*

Q.    So when you said I don't know if there was drugs in Maggie's purse, you're telling the truth?

A.    Like, I never seen it, *but it could have been,* you know.

Q.    And I was going to ask you that too.  That's twice now you said I don't think so *but she could have.*

A.    *Yeah.*

Q.    And you're telling the truth?

A.    Yeah.

3PCR T. at 355-356; 358; 360 (emphasis added).  Konczak testified at trial,

Q.    So then at some point are you able to be booked into the jail?

A.    Yes.  We were out there for probably 20 minutes, I would say.  And then we went in.  We were processed through the jail, where they take all of our stuff and start doing inventory on it.  My inventory was taken.

And I guess Officer Hout found a little envelope of --like, a piece of paper that had about $20 worth of heroin in it.  I didn't know it was in there.  It was in a little pill bottle of mine.  And I was freaked out because I was

afraid was going to get conveyance with trying to bring the illegal substance into the jail. So Miss Hout had went through the stuff. She gave it to Officer Garn.

Officer Garn came into my jail cell and he says, Whose is this? And he said it was in the flowered bag, which it was mine. I said the flowered bag was mine but I didn't know that I had it in there. He basically looked at me and said, If you get ahold of me when you get out of here, this goes away.

Q. What was his body language? Did he do anything to indicate what he was going to do? How it was going to go away?

A. More the eyes. Not so much body language or leaning in, but the eyes. You can tell. I don't know. A woman can tell when a man is hitting on her or attracted to her, so on and forth.

* * *

Q. And you said that Corrections Officer Hout found something in your bag. How do you know that?

A. Because I could see her. Where we were in the jail cell, you could see how when she was looking through stuff and you could see her pull that out of my pill bottle and purse.

Q. And when you say you saw her pull that out, did you recognize what that was?

A. Yes, I did. Instantaneously, I did.

Q. You said that you had the flowered bag. How big was this bag?

A.      Probably about this big.  And anyone who knows female fashion calls it a hippie bag.  It goes over your shoulder.  There's no pockets in it. It's just one big bag probably about that big.

Q.      So probably a foot and a half by about a foot or so?

A.      Um-hum.

Q.      Can a lot of things fit in there?

A.      Oh, yeah.

* * *

Q.      And this pill bottle, was this a pill bottle that you used on a regular basis?

A.      No.  It was just -- I had been prescribed depression medication.  And I was in my addiction, so I was not taking it.  *It basically sat in my purse for probably two or three months.*

Q.      So you were self-medicated?

A.      (The witness nodded.)

Q.      Is that a yes?

A.      I'm sorry.  Sorry.  Yes.

* * *

Q.      Now, you recognize it right away.  You said were self-medicating with the heroin so you weren't -this pill bottle at the time.  *So were you surprised that you had left heroin in your purse?*

A.      *Very.*

Q.      If you had remembered that the heroin was in your purse, would you have been stealing that day?

A.      Absolutely not.

Q.      But you didn't remember?

A.      *No.  I wouldn't have been out stealing.  That makes it a moot point, really.*

4T. at 115-119 (emphasis added).  Brandy Vance did not testify that she was able to observe or hear the interaction between Konczak and Garn when Garn told Konczak that, "If you get ahold of me when you get out of here, this goes away."

{¶110} We conclude that the testimony of Vance does not contradict the testimony of Konczak with respect to Konczak had heroin in a pill bottle inside her purse that she had forgotten about and in testifying that Garn told Konczak that, "If you get ahold of me when you get out of here, this goes away."  Therefore, there is no reasonable probability that, but for counsel's failure to call Vance as a witness at trial, the result of the proceeding would have been different.

{¶111} Having reviewed the record that Garn cites in support of his claim that he was denied effective assistance of counsel, we find Garn was not prejudiced by defense counsel's representation of him.  The result of the trial was not unreliable nor were the proceedings fundamentally unfair because of the performance of defense counsel.  The testimony of Brandy Vance cannot reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*8). Cumulative Effect.*

{¶112} Garn argues, "[e]ach *Brady* violation independently meets the standard for a new trial.  However, the Court must look at the aggregate effect of the *Brady* violations.

It must not parse each one and determine whether each one individually and independently requires new trial. *State v. Fears,* 86 Ohio St. 3d 329 (1999). The effect of nondisclosure must take into account the cumulative effect of the suppressed evidence in light of the other evidence." *Merit Brief For Appellant*, filed Nov. 20, 2018 at 25.

{¶113} In *State v. Brown*, 100 Ohio St.3d 51, 2003–Ohio–5059, 796 N.E.2d 506, the Ohio Supreme Court recognized the doctrine of cumulative error. However, as explained in *State v. Bethel*, 110 Ohio St.3d 416, 2006–Ohio–4853, 854 N.E.2d 150, ¶197, it is simply not enough to intone the phrase "cumulative error." *State v. Sapp*, 105 Ohio St.3d 104, 2004–Ohio–7008, 822 N.E.2d 1239, ¶103.

{¶114} Where we have found that the trial court did not err, cumulative error is simply inapplicable. *State v. Carter*, 5th Dist. Stark No.2002CA00125, 2003–Ohio-1313 at ¶37. To the extent that we have found that any claimed error of the trial court was harmless, or that claimed error did not rise to the level of a *Brady* or *Napue* violation, we conclude that the cumulative effect of such claimed errors is also harmless because taken together, they did not materially affect the verdict. *State v. Leonard*, 104 Ohio St.3d 54, 89–90, 2004–Ohio–6235, 818 N.E.2d 229, 270 at ¶ 185.

{¶115} As this case does not involve multiple instances of error, Garn's claim of cumulative error must fail.

*9). Res judicata bars Garn's arguments concerning Case No. 2015 CR 0635, cross-examination of Kelly Harding, and the victim impact statement of Margaret Konczak.*

### aa)). Menacing by Stalking count in case number 2015 CR 0637.

{¶116} Garn argues, "The trial court erred in failing to address the Menacing by Stalking count which was indicted under a new case number by the state in effort to

correct an error in the indictment. On July 16, 2015, the State filed a motion to join indictments. The trial court discussed the consolidation of counts at the July 16, 2015 hearing expressing an intent to consolidate. The Court noted, specifically, that the re-indictment was merely to correct the improper exclusion of a single count. (Tr. Vol. 2 at 5-15). The Court granted the State's motion to join the cases and the cases were tried and sentenced together. (Tr. Vol. 12)." *Merit Brief For Appellant*, filed Nov. 20, 2018 at 29-30.

**1]. Garn failed to raise any error in the trial court's ruling concerning the joinder of indictments or any defects in the indictments during his direct appeal.**

{¶117} Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment. *State v. Szefcyk*, 77 Ohio St.3d 93, syllabus, *approving and following State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104(1967), paragraph nine of the syllabus.

{¶118} To the extent that appellant argues the indictment was defective, he was required to raise this issue before trial. See Crim. R. 12(C)(2); *State v. Schultz*(1917), 96 Ohio St. 114, 117 N.E. 30; *State v. Mills* (1992), 62 Ohio St. 3d 357, 363, 582 N.E.2d 972, 980 (Under Crim. R. 12(B) and 12(G), alleged defects in an indictment must be asserted before trial or they are waived").

{¶119} Here, Garn did not raise in his direct appeal that the indictment was defective. Nor did Garn raise in his direct appeal that the trial court erred by joining the

case for trial. Garn was not represented by the same attorney who had represented him at trial. Garn could have, but did not, raise that argument in his direct appeal. *See*, *Garn, I* at ¶4.

{¶120} We find that Garn's arguments concerning case number 2015 CR 0637 are barred by res judicata because he could have, but did not raise the arguments during his direct appeal.

### bb)). Kelly Harding

{¶121} Garn argues, "One of Mr. Garn's responsibilities was traffic enforcement, known as the STEP program. One of the areas commonly used for that purpose was close to Kelly Harding's home. (Tr. Vol. 7 at 112). After Mr. Garn stopped Harding for a traffic ticket, Mr. Garn started stopping over at her house, with increasing frequency after a while. (Tr. Vol. 4 at 239). The defense made significant efforts at trial to get into evidence that Harding was afraid to recant her testimony because she was threatened by the prosecution. (Tr. at 261). The state denied any knowledge of her recantation on record in response to defense counsel's motion to compel. (Tr. 37, 187, 202, 204, 211). Harding had testified in a prior deposition that she tried to recant but the state threatened her with legal charges.[12] (Tr 258). She did not know the prosecutors by name; however, she stated that it was a lady and a man. The threat was believed to be that they would put her into jail if she recanted. This Court meaningfully restricted defense counsel's ability to inquire on this matter, limiting the

---

[12] No deposition testimony of Kelly Harding was entered into evidence at trial or during the hearing on the PCR petition. Nor was the deposition sealed and made a part of the record for purposes of appellate review. *See, State v. Hooks* (2001), 92 Ohio St.3d 83, 2001-Ohio-150, 748 N.E.2d 528(2001)(A reviewing court cannot add matter to the record before it that was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter.).

inquiry to whether she was afraid of "legal 'consequences." To which, she answered, "yes." (Tr. 263).

**{¶122}** "In light of the testimony at the post-conviction hearing referencing multiple interviews with witnesses who wanted to recant, Mr. Garn's conviction for Menacing by Stalking is highly suspect." *Merit Brief For Appellant*, filed Nov. 20, 2018 at 11-12.

### *1]. Garn failed to raise any error in the trial court's ruling concerning the cross-examination of Kelly Harding during his direct appeal.*

**{¶123}** At sidebar the state explained, "any statement the prosecutor would have made about that, as a witness, if you don't come and we subpoena you, we're going to put you in jail as a material witness. That's a common procedure, a common tactic. She's not sophisticated enough to understand the difference. The way it's going to come out is totally prejudicial and not probative in any way. (4T. at 259). The trial court ruled,

**{¶124}** I think you can ask her why she ultimately did not take her statement back. *You can't get into what was said because it would be hearsay, but you can ask her, if she wanted to recant, why did she not recant…*

4T. at 260 (emphasis added). The defense then asked Harding,

> Q.     There's been a little bit of time, but I'm going to ask you about your recantation. I think you said you can't take it back. Is that right?
>
> A.     Right.
>
> Q.     Were you afraid of legal ramifications if you took the statement back?

A.    Yes.

4T. at 263.  However, Harding immediately thereafter testified,

Q.    Miss Harding, the statement that you gave here today in court and the previous statements you've made, did you make any of that up?

A.    No.

Q.    Is it all the truth?

A.    Yes.

Q.  Did anyone ever tell you to come in here and tell anything other than the truth?

A.    No.

4T. at 263-264.  In his direct appeal, we found Garn's convictions for offenses involving Kelly Harding were not against the manifest weight or the sufficiency of the evidence. *Garn, I* at 23; 54.

**{¶125}** With respect to Ms. Harding, the jury found Garn not guilty of 3 LEADS violations (Counts One, Two and Four), Burglary (Count 32), Trespass (Count 33) and Attempted Gross Sexual Imposition (Count 34). In addition, the trial court granted Garn's Criminal Rule 29 motion for acquittal on Attempted Sexual Battery (Count 35). (8T. at 952-953).

**{¶126}** The defense was aware of the recantation information and cross-examined Harding about her attempt to recant during Garn's jury trial.  *See*, *State v. Ketterer,* 126 Ohio St.3d 448,2010-Ohio-3831, 935 N.E.2d 9, ¶ 36 ("no *Brady* violation occurs where a defendant knows of essential facts permitting him to take advantage of

exculpatory information or where evidence is available from another source." *citing United States v. Clark* (C.A.6, 1991), 928 F.2d 733, 738). We find no credible, substantive evidence that there were multiple witnesses who had attempted to recant, or had lied, or had failed to inculpate Garn.

{¶127} Garn did not raise an assignment of error in his direct appeal that the trial court erred by improperly restricting his cross-examination of Harding. Therefore, any argument that the trial court erred in this respect is barred by res judicata.

### cc)). Victim Impact Statement

{¶128} Garn argues,

Furthermore, as discussed, because *Brady* applies to guilt and punishment, the nondisclosure of this report affects the sentencing of Mr. Garn. At the post-conviction hearing, the current Richland County Prosecutor acknowledged that Konczak was not a victim. (Tr. Vol. 2 at 118). *See Napue v Illinois*, 360 U.S. 264 (1959) (holding that the knowing use of false testimony by a prosecutor in a criminal case violates the Due Process Clause of the Fourteenth Amendment). This is an important assertion for two reasons- the first being that the State argued adamantly throughout the trial that Mr. Garn's motivation for allegedly destroying evidence was a sexual motivation; the second being that Konczak was permitted to provide a victim impact statement at sentencing. Notably, Konczak was the only alleged victim to make a statement at sentencing. The trial court abused its discretion in finding in its judgment entry that motive is not an element of tampering as the trial

court used alleged sexual motivations on behalf of Mr. Garn towards

Konczak to impose a maximum consecutive sentence on the Tampering

with Evidence Charge.  (JE at 31).

*Merit Brief For Appellant*, filed Nov. 20, 2018 at 27-28.

**1]. Garn failed to raise any error in the trial court' concerning the victim impact statement of Margaret Konczak or to assign as error in his direct appeal that trial counsel was ineffective for failing to challenge the testimony.**

{¶129} Any argument that the trial court erroneously considered statements made at the sentencing hearing regarding an individual who was not a victim of the crimes for which Garn was convicted, or that sexual motivation was an improper sentencing factor for destruction of evidence crime could have been made in the trial court before or during sentencing for Garn.  *See, e.g. State v. Byrd,* 12th Dist. Warren Nos. CA2001-02-012, CA86-03-020, 2003-Ohio-511. The argument does not depend upon any evidence dehors the record. In addition, Garn never alleged during his direct appeal that his trial counsel was ineffective for failing to object to the victim impact testimony or failing to object to the trial court's consideration of sexual motivation as a sentencing factor at the trial level.

{¶130}  Accordingly, these arguments are barred by res judicata.

**CONCLUSION.**

{¶131} Garn's sole assignment of error is overruled.  The judgment of the Richland County Court of Common Pleas is affirmed.

By Gwin, P.J.,

Wise, John, J., and

Baldwin, J., concur